# IN THE COURT OF APPEALS OF IOWA

No. 24-1199
Filed December 17, 2025

**IN RE THE MARRIAGE OF ROSA STOCKER
AND CHAD MICHAEL STOCKER**

**Upon the Petition of
ROSA STOCKER, n/k/a ROSA NICOSIA,**
        Petitioner-Appellee,

**And Concerning
CHAD MICHAEL STOCKER,**
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Polk County, Scott J. Beattie, Judge.


        A husband appeals various provisions of the decree dissolving his marriage with his former wife. **AFFIRMED AS MODIFIED AND REMANDED WITH INSTRUCTIONS.**


        Anjela A. Shutts and Sydnee M. Waggoner of Whitfield & Eddy, P.L.C., Des Moines, for appellant.

        J.D. Hartung and Suzane L. Woollums of Hartung Schroeder Law Firm, Des Moines, for appellee.


        Considered without oral argument by Schumacher, P.J., and Buller and Sandy, JJ.

**SANDY, Judge.**

Chad Stocker appeals the June 2024 order dissolving his marriage with Rosa Stocker. Chad argues the district court erred in distributing the property of a business entity, using the wrong date as the date of retirement account valuation, failing to apply an income equalization pursuant to the temporary matters stipulation, failing to order Rosa to amend 2023 income tax returns, and failing to equitably distribute certain assets and liabilities. Both parties request appellate attorney fees. We modify the decree by applying a 2022 income equalization and assessing additional income to Rosa for the year 2023. We affirm in all other respects, remand to the district court for entry of an order consistent with this opinion, and decline to award either party appellate attorney fees. Costs of the appeal shall be divided equally between the parties.

## BACKGROUND FACTS AND PROCEEDINGS

Chad and Rosa were married in April 2004. At that time, Rosa had physical care of her two children from her previous marriage and was a nurse working in labor and delivery at Illini Hospital in Silvis, Illinois. Chad had no children and was attending his internal medicine residency program following completion of medical school in Des Moines. The district court found that "[n]either party had significant pre-marital assets" but Chad "brought in significant debt from medical school." A firm amount for Chad's pre-marital medical school debt was not established, but he "testified that it was in excess of $200,000." Shortly after they were married, Chad obtained his Iowa medical license.

The parties had two children during the marriage, born in 2005 and 2006. During the marriage, Rosa was the primary caretaker for the parties' children in

addition to her two other children.[1]  Even while acting as primary caretaker, she continued to work weekend shifts at Methodist Hospital in Des Moines as a labor and delivery nurse.

Following completion of his residency, Chad worked as a hospitalist at Mercy Hospital in Des Moines on a "week-on/week-off" shift.  The district court found that Rosa continued to provide most of the care for the children during Chad's "off-weeks."  During this time, Rosa was also working towards a Bachelor of Science in Nursing at Graceland University, which she finished in 2009, as well as a Master of Science in Nursing through the University of Cincinnati.  Following completion of her master's degree, Rosa became licensed as an Advanced Registered Nurse Practitioner (ARNP).

After becoming licensed as an ARNP, Rosa worked as a dermatology specialist at Iowa Dermatology and its sister company, Radiant Complexions Dermatology[2] (together, "RC"), starting in 2011.  During her four-year tenure at RC, Rosa referred Chad to the company and helped him obtain employment as a physician at the Marshalltown office in 2012.

In 2014, Chad and Rosa started a company named CNR Development, LLC (CNR).  That entity was formed for the purpose of operating as a MaidPro franchisee, a national franchise providing residential and commercial cleaning services.  According to Chad, the MaidPro franchise served "as a proof of concept that we could actually run a business successfully with the idea to eventually sell

---

[1] All issues relating to custody and care of the children were resolved following the district court's approval of the parties' "Stipulation and Agreement re Custody."
[2] Although always owned by the same individual, Iowa Dermatology was eventually merged into Radiant Complexions Dermatology.

that franchise and then transition into a [dermatology] practice." The CNR operating agreement established that Rosa and Chad were the two members, each with a fifty percent ownership interest. The operating agreement also provides that the members agree to refrain from competing with CNR. Due to dissatisfaction with the company, Rosa quit her job at RC shortly after the formation of CNR. Because she had a three-year noncompete contract with RC, Rosa managed CNR's MaidPro operations for about three years following her resignation from RC.

Chad and Rosa sold the MaidPro franchise in 2018, and Rosa then started working as a dermatology specialist at Skin Gym Dermatology in West Des Moines. Around this time, Rosa began identifying locations around central Iowa that would be a good fit for her and Chad to start a dermatology business. She sought out communities that were underserved in the field. The parties then started Dermatology of Central Iowa (DCI),[3] which is operated through the CNR business entity. DCI's first three locations were established in Newton, Pella, and Ottumwa in 2019. DCI expanded into Centerville and Nevada, Iowa, in 2020. Rosa coordinated most of DCI's startup, negotiated the initial leases, and was the initial practitioner. Chad contributed to the business by tracking taxes and financials for approximately five hours per week. Rosa provided all revenue-generating services, alternating locations based on the day of the week. The district court found that differing visions relating to DCI's management led to increased friction between Chad and Rosa.

---

[3] While we refer to the business operations as DCI and the legal entity as CNR, DCI is simply the d/b/a of CNR.

Chad was fired from RC in early 2020 and found work as an internal medicine physician at Iowa Clinic in Ankeny around a year later in summer 2021. Rosa filed for divorce in September 2021. At the time of Rosa's filing, Chad was working full time at Iowa Clinic. Rosa continued running most operations at DCI until Chad was fired from Iowa Clinic in spring 2022. Chad and Rosa came to a temporary matters agreement in February 2022 which reiterated the terms of the CNR operating agreement and set Rosa's salary at DCI to be equal to Chad's Iowa Clinic salary "during the pendency of" the dissolution proceedings.

Around the time of his firing, Chad began taking a greater role in DCI's business operations, including keeping tabs on Rosa's patient scheduling and chastising her for taking time off or long lunches. They had many disagreements over management of the company. One such disagreement was based out of Rosa's departure from the Pella and Ottumwa clinics. Rosa wanted to send letters to patients explaining the turnover to a new provider but Chad disagreed, arguing that such a letter would "cost thousands" and come across as negative. He hired staff and caused some staff members to leave the company. One assistant later explained in her exit letter that she "adore[d]" working for Rosa but that "Chad has made [her] work experience unpleasant to say the least." The assistant also stated that Chad would put her in the middle of conflicts between him and Rosa and threatened to sue her on her last day.

The increasing tension between Chad and Rosa and the staff led to a number of filings in the dissolution proceedings. Chad filed a petition to modify the temporary stipulation seeking to reduce Rosa's salary, reasoning that the loss of his job at the Iowa Clinic required "re-equaliz[ing] the parties' earnings during the

pendency of this case." Rosa then filed an application for rule to show cause, arguing Chad had violated the parties' February temporary matters agreement, arguing Chad had been making unilateral decisions regarding DCI's management, and requesting the business be evenly split between Rosa and Chad.

The district court subsequently granted that request to split the business, observing that Chad and Rosa "[b]oth make accusations against each other, so it is obvious they have reached a point where the business would benefit by this move. This will allow each party to focus on their assigned locations without looking over their shoulder." Following that split, Rosa began operating her locations—Newton, Nevada, and Centerville—through an existing entity called Frontline Dermatology, LLC (Frontline). Chad was awarded Pella, Ottumwa, and Marshalltown. Rosa had created the Frontline entity in July 2022 in anticipation that the dissolution would be resolved via settlement and that Chad would buy her out of CNR. By early 2023, Rosa was providing dermatology services in Spencer through Frontline. Although Rosa assisted Chad in management of his locations following the district court's split of CNR, the parties did eventually fully separate their businesses. The district court found that this split ended "the daily discord between them."

Following the September 2023 trial and post-trial filings which were submitted by April 2024, the district court issued its dissolution decree later that month on April 20. The parties filed motions to reconsider which the district court

addressed in a June 2024 order. The court clarified portions of the original dissolution decree in an order nunc pro tunc.[4]

Chad now appeals from the dissolution decree.

## STANDARD OF REVIEW

We review dissolution proceedings de novo. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). But we give the district court's factual findings weight, "especially to the extent credibility determinations are involved." *Id.*

## DISCUSSION

Chad argues the district court failed to exercise equity in (1) its distribution of CNR between the parties, (2) failing to use the close-of-evidence date as the retirement-account-valuation date, (3) failing to equalize the parties' 2022 incomes, (4) failing to order Rosa to amend 2023 tax returns to reflect fringe benefits from CNR , and (5) improperly including certain assets in its property division. Chad and Rosa both request appellate attorney fees.

### I. Distribution of CNR

The district court is tasked with equitably distributing all marital property at the time of the dissolution, which does not include inherited property or property gifted to one spouse. *In re Marriage of Keener*, 728 N.W.2d 188, 193 (Iowa 2007); *see also* Iowa Code § 598.21(5) (2024). Although equity is not synonymous with equality, equality of distribution is most often the most equitable distribution. *Keener*, 728 N.W.2d at 193.

---

[4] In its order nunc pro tunc, the district court also amended the original decree in respect to the time limit for sale of the marital residence, Rosa's payment of taxes and expenses, and payment of the children's automobile expenses.

The district court "must identify all of the assets held in the name of either or both parties as well as the debts owed by either or both of them." *Id.* Asset values should be assessed as of the date of trial, which serves the purpose of an equitable distribution. *See id.* "The purpose of determining the value is to assist the court in making equitable property awards and allowances." *Id.* (citation omitted). But closely held businesses are difficult to accurately value. *In re Marriage of Wiedenmann*, 402 N.W.2d 744, 749 (Iowa 1987). We thus give deference to the district court's findings if they are "well within the range of the evidence." *See id.*

For assets that are not easily divisible, it is often easiest to order the asset's sale and then divide the proceeds. *See In re Marriage of McDermott*, 827 N.W.2d 671, 683 (Iowa 2013). Yet because forced sales often bring lower values, this is not the preferred method of division. *See id.* Thus, an equalization payment is preferred where the asset cannot be easily divided. *Id.* But division is nonetheless preferred above sale or an equalization payment when feasible *See id.*

Chad makes two arguments regarding the district court's distribution of CNR. First, that the district court failed to do equity when it declined to assess a specific value to CNR. Second, he argues the district court should have awarded him CNR and required an equalization payment be made to Rosa. We will first address Chad's second argument because our analysis on that issue is dispositive as to his valuation argument.

The district court decreed that

Rosa's proposed resolution to split [CNR] by locations is a reasonable and more equitable approach. In handling the division in that manner, the market value of CNR is not crucial. Instead, each

party would be awarded three CNR locations and be allowed to operate them as s/he deems appropriate. While not typically done, this approach suits this case well. The business is far easier to divide than most businesses; both parties are deeply involved in the business, and the parties have been operating in a divided manner for some time. As such, the Court will divide the business in the manner previously ordered by the Court in its Order Modifying Temporary Stipulation of November 4, 2022.

Chad contends that he should have been awarded the entirety of CNR and ordered to make an equalization payment to Rosa. We disagree. Chad's argument largely revolves around the fact that the split ordered by the district court is not the typical method for dividing businesses. We do not divide assets by determining what method is most common, rather, we ask what division does equity. *See Keener*, 728 N.W.2d at 193.

Chad takes issue with the court referring to Rosa's locations as Frontline and his locations as CNR when all locations are technically part of CNR. But we find that this argument supports the district court's decision to split the company. Chad admits that Rosa has been operating her Newton, Nevada, and Centerville locations as a part of her Frontline entity since the split by the district court in November 2022. So by the date that the court entered its dissolution decree, Rosa's locations had functionally been operating as a separate entity for over a year and a half. And as the district court found—and the parties do not dispute—the tension between the parties vastly declined after the split. The time between the temporary stipulation and the decree proved that the separate businesses could thrive under the conditions the district court permanently enshrined in the decree.

We are not compelled by Chad's argument that "economies of scale" make the split inequitable. There is no dispute that having more locations allows certain costs to be more diffused, but based on the year and a half these businesses have been operating separately, the slightly increased overhead has not been fatal to the businesses' viability.

Each party was awarded three locations. Chad was awarded two of CNR's three original locations. CNR was successful enough in those original locations that it was able to expand significantly. And Chad now has the advantage of an established client base that CNR lacked when it was first starting. Chad has not presented evidence that CNR cannot run profitably under the new division.[5]

Next we address Chad's claim that the district court should have assigned a value to CNR. We agree with Chad here; the law is clear that the district court "must identify all of the assets held in the name of either or both parties," and "[t]he assets should then be given their value as of the date of trial." *Keener*, 728 N.W.2d at 193. While our case law recognizes that closely held businesses are difficult to value, that does not lessen the court's duty to assign such a value. *See McDermott*, 827 N.W.2d at 683.

Yet, in light of our decision that evenly splitting the business was equitable, we do agree with the district court that "the market value of CNR is not crucial" to an equitable distribution under the specific circumstances of this case. Even if we

_____

[5] Chad additionally claims that the court's order to transfer all patient records to the location where they seek treatment "ignores the practical hurdles of transferring patient files and confidential medical records." But he does not provide further explanation or authority for this claim, so we will not speculate further.

accepted Chad's expert's valuation that the company is worth $550,000, it does not change our determination that CNR should be evenly split.

We thus find equity was served through the district court's division of CNR.

## II. Date of Retirement Account Valuation

Chad next argues that the district court should not have used the date of the close of evidence (April 1, 2024) rather than the date of trial (September 23-26, 2023) as the valuation dates for the parties' retirement accounts. The district court used the parties' financial disclosures that had been most recently submitted at the time of trial which reflected June 2023 retirement account values.

Chad's argument on this issue is vague and speculative. He simply contends that "[t]he trial court failed to consider the most accurate and recent values of the parties' retirement accounts which resulted in a failure to do equity with the property distribution." But there are no more recent financial disclosures available in the record. Chad's motion to reopen the record contained no request for updated financial documents from Rosa, and he subsequently failed to file any exhibits updating the values of his own retirement accounts. And the district court had reopened the record on Chad's request to allow him "to file any affidavits and/or exhibits he desires."

The district court arrived at its valuation based on the information provided by the parties at the time of trial. Due to the inadequate evidence available in the record to value the retirement accounts on April 1, 2024, it was equitable for the district court to abide by the general rule that "[m]arital property typically is valued as of the date of the trial." *In re Marriage of Thatcher*, 864 N.W.2d 533, 545 (Iowa 2015).

### III. 2022 Income Equalization

Chad argues that the district court failed to act equitably when it failed to equalize his and Rosa's incomes for 2022, as required by the parties' temporary matters stipulation adopted by the district court. We agree. Indeed, the stipulation set Rosa's 2022 salary at $235,000, equal to Chad's salary at Iowa Clinic. Yet, the agreement expressly provided that the parties' 2022 incomes were to be equalized: "Should it become clear that the party's respective net incomes were not equalized as was the intention, the individual and separate funds will be utilized to equalize their net incomes."

Rosa incorrectly asserts that "there was no provision to 'equalize' the parties' incomes," which directly contradicts the aforementioned temporary-matters-agreement provision. Rosa's position also contradicts Chad's unrebutted assertion that Rosa made a $131,488 equalization payment to him for 2022. Rosa's own exhibit suggests that, following that first equalization payment, she still owes Chad $32,522 to equalize the parties 2022 incomes. Rosa does not dispute Chad's equalization calculations; she only disputes whether income equalization is required. Since equalization is required under the parties' 2022 temporary matters agreement, we remand to the district court for entry of an order directing Rosa to make a $32,522 equalization payment to Chad.

### IV. 2023 Tax Returns

Chad next contends that the district court improperly failed to consider Rosa's personal vehicle lease payments as income. Rosa's vehicle lease was paid by CNR in 2023. Chad argues this was a fringe benefit paid by CNR, and as such, should have been considered as income by the district court. Because the

district court failed to consider those payments as Rosa's income, Chad argues he was saddled with the tax burden of those payments when paying CNR's 2023 income taxes.

Rosa does not contest Chad's assertions that CNR covered the costs of her personal vehicle lease. She instead argues that "each party was on his/her own to operate their separate locations as they deemed appropriate." This may be true, but the parties' authority to operate independently of one another did not include authority to intermingle personal expenses with business expenses. *See In re Marriage of Orton*, No. 24-0891, 2025 WL 3022709, at *3 (Iowa Ct. App. Oct. 29, 2025) ("[The] district court properly increased self-employed [spouse]'s income by amounts taken from business for personal use but claimed as business expenses on [spouse]'s tax returns.") Personal expenses paid for by the business should be classified as personal income, *see id.*, and Rosa does not deny that the vehicle lease was a personal expense, nor does she argue that the vehicle was a corporate-owned vehicle that she also used personally, *cf. In re Marriage of Mahoney*, 977 N.W.2d 518 (Iowa Ct. App. 2022) (explaining that personal use of a corporate vehicle is an employment benefit not encompassed within "the definition of net monthly income" (citation omitted)).

Further, there is no evidence in the record supporting or assigning a reasonable dollar amount to Rosa's suggestion that the 2023 services she provided to Chad's half of the business would balance out any income she derived from the vehicle lease payments. We remand to the district court for entry of an order directing that Rosa's 2023 IRS Form K-1 from CNR should include any

payments made on Rosa's personal vehicle lease within that tax year in addition to the $39,000 assessed in the court's order nunc pro tunc.

## V. Asset Distribution

Chad lastly argues that two of his individual assets were erroneously categorized as marital assets—his 2015 Jeep Cherokee, valued at $8,515, and an investment valued at $5,175. He also asserts that the remaining proceeds to be paid on the MaidPro sale were incorrectly valued by the district court at $65,000. Chad assesses the value of those proceeds at $39,962.

But as Rosa points out, the district court allocated $1,107,649 in assets to Chad and $1,084,493 to Rosa. Further, the district court's decision to forgo awarding Rosa any spousal support should be considered when assessing its distribution of marital assets. *In re Marriage of Trickey*, 589 N.W.2d 753, 756 (Iowa Ct. App. 1998). The removal of the Jeep and Chad's investment from the slate of marital assets would still result in Chad being awarded a greater share of the total marital assets. And even if we additionally accepted Chad's valuation for the MaidPro sale, his total share of the marital assets would only fall to $1,068,921—making each spouse's respective share of the marital assets within two percent of the other spouse's share.

We do not find that result to be inequitable and thus decline to tinker with the district court's marital-asset determination.

## VI. Appellate Attorney Fees

"Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). In light of the parties similar financial positions and the fact that Chad and Rosa each

prevailed in part on this appeal, we hold that Chad and Rosa shall each be responsible for their own appellate attorney fees. Chad and Rosa shall equally split appellate costs.

## CONCLUSION

In sum, we modify the decree by applying a 2022 income equalization and assessing additional income to Rosa for the year 2023. We affirm in all other respects, remand to the district court for entry of an order consistent with this opinion, and do not award either party appellate attorney fees. Costs of the appeal are split equally between the parties.

**AFFIRMED AS MODIFIED AND REMANDED WITH INSTRUCTIONS.**